THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: May 3, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Azeka Building Corp.*
*v.*
*Bryan Kenji Azeka*

_____

Opposition No. 91218679

_____

Martin E. Hsia of Cades Schutte LLP
    for Azeka Building Corp.

Michael Gerity of Israel & Gerity PLLC
    for Bryan Kenji Azeka.

_____

Before Quinn, Ritchie, and Shaw, Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

Bryan Kenji Azeka ("Applicant") filed an application to register the mark AZEKA'S RIBS (in standard characters) (RIBS disclaimed) on the Principal Register for "barbeque sauce" in International Class 30.[1]

Azeka Building Corp., successor-in-interest to Azeka Enterprises Inc. ("AEI") (collectively, "Opposer") opposed registration on the following grounds:

---

[1] Application Serial No. 86246563, filed April 9, 2014, pursuant to Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), alleging a bona fide intention to use the mark in commerce.

1) That the proposed mark is primarily merely a surname;

2) Lack of a bona fide intention to use the mark in commerce; and

3) Likelihood of confusion.

Applicant denied the salient allegations comprising these claims. Applicant also alleged the defenses that Opposer lacks standing and that Opposer abandoned its mark.[2]

### *The Record*

Opposer set forth the record in detail in its brief (28 TTABVUE 9); Applicant concurred with this description. (31 TTABVUE 7).[3] The record consists of the pleadings; the file of the opposed application; testimony with related exhibits, taken by Opposer (20, 21, 22 TTABVUE); official records, excerpts of printed publications and of third-party websites, and Applicant's responses to Opposer's discovery requests, all introduced by Opposer's notices of reliance (19 TTABVUE; 27 TTABVUE); testimony, with related exhibits, taken by Applicant (26 TTABVUE); official records, excerpts of third-party websites, and various documents, all made of

---

[2] The Board, in an order dated December 18, 2015, denied Opposer's motion for partial summary judgment, finding that genuine disputes of material fact remained with respect to Opposer's standing, specifically with regard to its alleged abandonment of the mark, and with respect to Applicant's bona fide intent to use the mark in commerce. The Board also struck several allegations captioned as "Affirmative Defenses" in Applicant's answer. (17 TTABVUE).

[3] Citations in this opinion will be to the TTABVUE docket entry number and the electronic page number where the document or testimony appears. Because the Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to non-confidential parts of the record include the TTABVUE docket entry number and the TTABVUE page number. *Cf.* TBMP § 801.01 (Jan. 2017) (parties should cite to record by referring to the TTABVUE entry and page number).

record by way of Applicant's notice of reliance. (24 TTABVUE).[4] The parties filed briefs on the case.

### Issues for Decision

Based on the evidentiary record, we sustain the opposition on the ground that AZEKA'S RIBS is primarily merely a surname. After our decision on the surname issue, there is no reason to consider the claim of a lack of a bona fide intent to use the applied-for mark; both of these claims bear on the same ultimate issue, that is, the registrability of Applicant's mark based on the *present* application. We have "discretion to decide only those claims necessary to enter judgment and dispose of the case," as our "determination of registrability does not require, in every instance, decision on every pleaded claim." *Multisorb Tech., Inc. v. Pactive Corp.*, 109 USPQ2d 1170, 1171-72 (TTAB 2013) (citing *Am. Paging Inc. v. Am. Mobilphone Inc.*, 13 USPQ2d 2036, 2039-40 (TTAB 1989)), *aff'd*, 923 F.2d 869, 17 USPQ2d 1726 (Fed. Cir. 1990) (non-precedential). The surname ruling ensures that the *present* application will not proceed to registration and, thus, there is no reason to consider the bona fide intent issue, because any determination that such intent exists or does not would not be preclusive of any challenge to a future application.

Although sustaining the surname ground is dispositive of Applicant's attempt to register the mark based on the *present* application, we also appreciate the logic in

---

[4] Some of the materials are not proper subject matter for a notice of reliance. (*See, e.g.*, email correspondence and press releases). Nevertheless, Opposer did not object to their introduction, but rather treated them as properly of record. Accordingly, we deem the evidence to be stipulated into the record, and consider all of the evidence submitted by the parties to be of record for our consideration, as the parties likewise have done. *See* TBMP § 707.04.

Applicant's contention that the Board should decide the merits of Applicant's abandonment defense and its effect on priority, an essential element of Opposer's likelihood of confusion claim, which forms an important part of the controversy. Applicant argues that deciding only the surname issue would be "a huge case of failing to see the forest for the trees, and litigating issues for the sake of litigation." Applicant maintains that the main controversy between the parties is whether Opposer has abandoned its mark, and that Opposer is attempting to have this proceeding

> resolved on a side issue that completely avoids the elephant in the room. This approach makes no sense whatsoever from any perspective. It makes no sense from a business perspective, because ending the Opposition on this issue still leaves the parties at odds as to future use of the mark. It makes no sense from a judicial economy perspective, because ending the Opposition on this issue will do nothing more than to cause Applicant to file yet another application for the same mark, this time under Trademark Act Section 1(a) because he is actually using the mark in commerce, and force the parties and this Board through an entire opposition process a second time, just to get back to the exact same critical issue that is before the Board right now. Such an approach finds no support in logic, reason or business-sense.

(31 TTABVUE 25-26).

In its reply brief, Opposer acknowledges that this case "is essentially a dispute over the exclusive right to use the family name [AZEKA] … between two branches of the Azeka family." (34 TTABVUE 6). The parties have focused much of their attention on this issue, realizing its broader impact on rights in the mark going forward. The parties have tried the issue of Opposer's abandonment of its pleaded mark, and in

4

doing so have expended time and money; and it is in the interest of judicial economy to decide the issue that is the crux of the dispute, which promises to continue in the absence of a complete resolution. There is nothing to be gained by forcing Applicant to file a new application, and by requiring the parties to submit much of the same evidence for a second time, which would needlessly increase the parties' litigation costs and burden the Board with largely duplicative litigation. Accordingly, we will consider this issue.

***Standing***

Standing is a threshold issue that must be proven in every *inter partes* case. *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014). *See also Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982) ("The facts regarding standing … must be affirmatively proved. Accordingly, [plaintiff] is not entitled to standing solely because of the allegations in its [pleading]."). Our primary reviewing court, the U.S. Court of Appeals for the Federal Circuit, has enunciated a liberal threshold for determining standing, namely that a plaintiff must demonstrate that it possesses a "real interest" in a proceeding beyond that of a mere intermeddler, and "a reasonable basis for his belief of damage." *See Empresa Cubana del Tabaco,* 111 USPQ2d at 1062 (citing *Ritchie v. Simpson,* 170 F.3d 1902, 50 USPQ2d 1023, 1025-26 (Fed. Cir. 1999)). A "real interest" is a "direct and personal stake" in the outcome of the proceeding. *Ritchie v. Simpson,* 50 USPQ2d at 1026.

Azeka Building Corp. is the named Opposer, and its president is Tyler Azeka ("Tyler"). The record establishes that in the 1970s, Tyler's father, Kusuo Azeka, also known as Bill Azeka ("Bill"), "invented" a recipe for marinated (with a "secret sauce") beef short ribs, and that the ribs were sold under the mark AZEKA'S RIBS at the Azeka's family business, Azeka's Place (later changed to Azeka's Market). (20 TTABVUE 9-10).

Based on the inclusion of AZEKA in Opposer's corporate name, and the fact that it is also the surname of Opposer's president, these established facts are sufficient to prove Opposer's standing to bring the surname claim under the liberal threshold set by controlling case law. Accordingly, Opposer has standing to pursue any of the other pleaded grounds. *See Jewelers Vigilance Comm. Inc. v. Ullenberg Corp.*, 823 F.2d 490, 2 USPQ2d 2021, 2023 (Fed. Cir. 1987) ("Once standing is established, the [plaintiff] is entitled to rely on any of the grounds set forth in … the Lanham Act which negate [defendants'] right to its subject registration.").

*Surname*

Opposer argues that Applicant's applied-for mark is primarily merely a surname under Section 2(e)(4) of the Trademark Act, 15 U.S.C. § 1052(e)(4). Applicant essentially did not respond, either with evidence or argument, to the merits of this claim.

Section 2(e)(4) of the Trademark Act precludes registration of a mark on the Principal Register that is "primarily merely a surname" without a showing of

acquired distinctiveness under Section 2(f) of the Act, 15 U.S.C. § 1052(f).[5] A term is primarily merely a surname if, when viewed in relation to the goods or services for which registration is sought, its primary significance to the purchasing public is that of a surname. *In re Eximius Coffee, LLC*, 120 USPQ2d 1276, 1277 (TTAB 2016); *In re United Distillers plc*, 56 USPQ2d 1220, 1221 (TTAB 2000). This expression of the test restates the rule set forth in *In re Kahan & Weisz Jewelry Mfg. Corp.*, 508 F.2d 831, 184 USPQ 421, 422 (CCPA 1975) ("[A] correct resolution of the issue can be made only after the primary significance of the mark to the purchasing public is determined …") and *In re Etablissements Darty et Fils*, 759 F.2d 15, 225 USPQ 652, 653 (Fed. Cir. 1985) ("*Darty*"). In *Darty*, the Federal Circuit considered several factors in determining whether the purchasing public would perceive a proposed mark as primarily merely a surname, including: whether the applicant adopted a principal's name and used it in a way that revealed its surname significance; whether the term had a nonsurname "ordinary language" meaning; and the extent to which the term was used by others as a surname. 225 USPQ at 653. The Board's oft-cited "*Benthin* factors," *see In re Benthin Mgmt. GmbH*, 37 USPQ2d 1332, 1333-34 (TTAB 1995), are also examples of inquiries that may lead to evidence regarding the purchasing

---

[5] As noted, the involved application was filed based on intent to use and thus, absent limited circumstances not applicable in this case, could not include a claim of acquired distinctiveness. *See* Trademark Manual of Examining Procedure (TMEP) § 1212.09 (Apr. 2017). Accordingly, approval of the mark in the application for publication for opposition necessarily means that the Examining Attorney did not consider the involved mark to be primarily merely a surname, and a review of the prosecution history of the file confirms that conclusion. The Examining Attorney's decision to publish the mark for opposition does not preclude an opposition under Section 2(e)(4) and is in no way binding on the Board's determination of the claim.

public's perception of a term's primary significance.[6] These inquiries or "factors" are not exclusive and any of these – singly or in combination – and any other relevant circumstances may shape the analysis in a particular case.[7] *In re Eximius Coffee, LLC*, 120 USPQ2d at 1278.

When we are faced with a claim relying on Section 2(e)(4) as a bar to registration of a term in standard character form, with no design elements, we consider the impact the term has or would have on the purchasing public because "it is that impact or impression which should be evaluated in determining whether or not the primary significance of a word when applied to a product is a surname significance. If it is, *and it is only that*, then it is primarily merely a surname." *In re Harris-Intertype Corp.*, 518 F.2d 629, 186 USPQ 238, 239 (CCPA 1975) (quoting *Ex parte Rivera Watch Corp.*, 106 USPQ 145, 149 (Comm'r Pat. 1955)) (emphasis in original).

Whether the primary significance of an applied-for mark is merely that of a surname is a question of fact. *See Darty*, 225 USPQ at 653-54. This question must be resolved on a case-by-case basis. *Id.* at 654; *see also, e.g., In re Pohang Iron & Steel*

---

[6] In *Benthin*, the Board stated that "factors" to be considered in determining whether a term is primarily merely a surname include: (1) the degree of a surname's rareness; (2) whether anyone connected with applicant has that surname; (3) whether the term has any recognized meaning other than that of a surname; (4) whether the term has the "structure and pronunciation" of a surname; and (5) whether the stylization of lettering is distinctive enough to create a separate commercial impression. Where, as here, the mark is in standard characters, it is unnecessary to consider the fifth factor. *In re Yeley*, 85 USPQ2d 1150, 1151 (TTAB 2007).

[7] *See Benthin*, 37 USPQ2d at 1333 (stating that notwithstanding the rareness of BENTHIN as a surname, panel "would find" that it "would be perceived as primarily merely a surname" because of lack of other meanings and because it is the name of applicant's Managing Director, but the highly stylized form shifted the balancing of factors to a finding that BENTHIN is not primarily merely a surname).

*Co.*, 230 USPQ 79, 79 (TTAB 1986). The entire record is examined to determine the primary significance of a term, and whether Opposer has shown, by a preponderance of the evidence, that the term must be denied registration.

Among the circumstances that may be probative in determining if an applied-for mark is primarily merely a surname are:

1) whether the term is the surname of anyone connected with the applicant;

2) whether the term has any recognized meaning other than as a surname;

3) whether evidence shows that the term has the structure and pronunciation of a surname;

4) whether there is contextual use related to surname significance; and

5) whether the evidence shows use of the term as a surname is rare.

*Eximius Coffee*, 120 USPQ2d at 1278; *see also In re Integrated Embedded*, 120 USPQ2d 1504 (TTAB 2016).[8] We will address the factors in the order presented above, acknowledging that there is no significance to the order. Rather, we weigh the circumstances together and accord the appropriate weight to each based on the evidence of record.

The first factor is obvious; Applicant's name is Bryan Azeka.

The second factor, whether AZEKA has a recognized meaning other than as a surname, also weighs in favor of finding the proposed mark to be primarily merely a surname. Opposer introduced "negative" dictionary evidence showing no listings for "Azeka." (19 TTABVUE 363-69). Further, Applicant indicated in his application that

---

[8] No other factors have been discussed by the parties, nor is there evidence that implicates the probative significance of any other possible factor, inquiry or circumstance.

the term has no other meaning. Thus, this factor supports Opposer's position that the primary significance of AZEKA is as a surname. *Eximius Coffee*, 120 USPQ2d at 1280.

The record is devoid of any evidence bearing on the third factor, namely whether AZEKA has the structure and pronunciation of a surname. Assessing whether AZEKA has the structure and pronunciation of a surname, is a "decidedly subjective" inquiry. *Benthin*, 37 USPQ2d at 1333; *see also Binion*, 93 USPQ2d 1531, 1537 (TTAB 2009). Under this factor, a party may submit evidence that, due to a term's structure and pronunciation, the public would or would not perceive it to have surname significance. *See Eximius Coffee*, 120 USPQ2d at 1280 (reference to purported surnames "without proving that they are surnames, without showing how common such surnames with the suffix 'OA' are, and without providing some other objective evidence of how members of the public perceive the structure and sound of ALDECOA is not sufficient to enable us to determine that ALDECOA has a structure and pronunciation similar to that of other purportedly common surnames"). As just noted, Opposer did not submit any evidence on this point and, in the absence of evidence, this factor is neutral.

With respect to the fourth factor relating to contextual clues, the mark AZEKA'S RIBS includes the surname AZEKA in the possessive form. The surname significance of a term is not diminished by the fact that the term is presented in its possessive form. *See In re Woolley's Petite Suites*, 18 USPQ2d 1810 (TTAB 1991). *See also* TMEP §1211.01(b)(v). In point of fact, the possessive form of the term, AZEKA'S as used in

the proposed mark AZEKA'S RIBS, is consistent with perception of the term as a surname. *In re Binion*, 93 USPQ2d at 1537.

We also must consider the inclusion of the word RIBS in the mark. Indeed, "[t]he test for determining whether a mark is primarily merely a surname is the primary significance of the mark *as a whole* to the purchasing public." *In re Hutchinson Tech. Inc.*, 852 F.2d 552, 7 USPQ2d 1490, 1492 (Fed. Cir. 1988) (emphasis added). In *Hutchinson Technology*, the applicant sought to register the mark HUTCHINSON TECHNOLOGY for certain computer components. Registration was refused on the ground that the mark was primarily merely a surname, and the Board affirmed. On appeal, the Federal Circuit reversed the refusal. In doing so it made clear that the assessment of a composite mark containing a surname is not limited to the inquiry of whether the additional term is capable of functioning as a mark or not.[9] *Hutchinson Tech.,* 7 USPQ2d at 1492-93 (in reversing, explaining that evidence did not establish that "technology" was generic or merely descriptive of the identified goods). Rather, as noted above, we must consider the meaning of the mark as a whole.

In the present case, the addition of RIBS in the mark does not detract from the primary significance of the surname AZEKA. That is to say, the purchasing public,

---

[9] In this respect, it appears that TMEP § 1211.01(b) is not consistent with the Federal Circuit's directive in *Hutchinson Technology*. The proper inquiry is the meaning of the mark as a whole, which is not limited only to the question of whether the additional matter is or is not capable of functioning as a mark, *i.e.*, whether the additional matter is generic. Merely descriptive terms are terms that have not acquired source identifying significance, and as such are terms—like generic terms—that will typically not detract from the primary surname significance in a mark containing a surname. Thus, if none of the additional matter that makes up the mark is inherently distinctive or has acquired distinctiveness (*e.g.*, it is merely descriptive or incapable), refusal of the entire mark pursuant to Section 2(e)(4) will be appropriate in most circumstances.

when encountering the proposed mark AZEKA'S RIBS, would perceive the mark in its entirety as primarily merely a surname. *See Miller v. Miller*, 105 USPQ2d 1615, 1622 (TTAB 2013). RIBS has been disclaimed and there is no dispute that this word, as used in connection with barbeque sauce, is at least merely descriptive, if not generic. Applicant has offered no evidence or argument that RIBS alters the meaning of the mark as a whole in such a way to displace the primary surname significance of AZEKA, which as noted above is reinforced by the use of the possessive.

That brings us to consider the fifth factor, namely, the rarity of the surname AZEKA. Opposer submitted excerpts of several phone directories throughout the United States showing search results for "Azeka." This evidence revealed a total of 868 listings of individuals with the surname AZEKA. Further, at least three websites show use of AZEKA as a surname, apparently giving the surname at least some public exposure in the media. (19 TTABVUE 13-15; 20-24; 37-41).

In sum, the record shows that Applicant's surname is AZEKA; there is no other meaning for AZEKA; the possessive form of the term, a contextual clue, is consistent with surname significance; and AZEKA, as shown by telephone directories and websites, has been exposed to the public as a surname. The circumstances and record of this case establish that the primary significance of AZEKA is as a surname, and the addition of RIBS does not diminish this primary significance when the proposed mark AZEKA'S RIBS is considered as a whole. There simply is no evidence in the

12

record that AZEKA would be perceived as anything other than as a surname, and Applicant does not contend otherwise. [10]

We therefore find that Opposer has established, by a preponderance of the evidence, that AZEKA'S RIBS is primarily merely a surname and, pursuant to Section 2(e)(4), is not registrable on the Principal Register absent a showing of acquired distinctiveness. Accordingly, the opposition is sustained on this ground.

In anticipation of this decision, Applicant stated that it

> has actually started to use the mark in commerce with the listed goods, but because of this pending Opposition, he is precluded by rule from amending his application to change the basis for filing to Section 1(a). *See* 37 C.F.R. § 2.133. Were it not for that rule, Applicant could easily resolve any conclusion that the Subject Mark was merely a surname by filing an acceptable allegation of use and amending the application to the Supplemental Register. 37 C.F.R. §2.47(d); TMEP §§ 816.02, 1102.03.
>
> If the Board were to find that Applicant's application is not entitled to registration on the basis that the mark is merely a surname, it should allow Applicant "time in which to file a motion that the application or registration be amended to conform to the findings of the Board." 37 C.F.R. § 2.133. Only that way can the parties and the Board avoid the waste of tens of thousands of dollars of litigation costs and over two years of litigation on this Opposition only to have to start over and come right back to this position two years and tens of thousands of dollars more down the road.
> (31 TTABVUE 26-27).

To the extent that Applicant contends that he should be allowed an opportunity to file an allegation of use along with an amendment to the Supplemental Register,

---

[10] Applicant filed application Serial No. 86246558 to register the mark AZEKA'S SAUCE for "barbecue sauce." After registration was refused for that application under Section 2(e)(4), the application was abandoned for failure to respond to the refusal. (19 TTABVUE 25-50).

that is not possible because, even though the mark has been approved for publication, the Office has not issued a notice of allowance. Trademark Act § 1(d)(1), 15 U.S.C. § 1051(d)(1); Trademark Act § 13(b)(2), 15 U.S.C. § 1063(b)(2). *See* TBMP § 219. "[A] notice of allowance will not issue unless and until the opposition is dismissed," so any allegation of use filed prior to a decision by the Board to dismiss the opposition is improper. *Id.* The Board's decision to sustain the opposition on the surname claim, and not to dismiss the opposition, means that Applicant cannot pursue his suggested course of action.

### *Likelihood of Confusion*

Because of our decision to sustain the opposition on the surname ground, Applicant is not entitled to obtain a registration on the basis of the present application. As indicated earlier, however, we appreciate that there is a significant controversy between the parties as to which is entitled to claim prior trademark rights in the AZEKA name going forward. Accordingly, we will proceed to consider this issue in the context of the likelihood of confusion claim.

Applicant does not dispute that the contemporaneous use of Opposer's pleaded mark AZEKA'S RIBS for marinated ribs prepared with a "secret sauce" and Applicant's identical mark AZEKA'S RIBS for barbeque sauce is likely to cause confusion. Rather, Applicant argues that the issue of likelihood of confusion is rendered moot by Opposer's abandonment of its rights in the pleaded mark. (31 TTABVUE 27).

We agree with the parties' conclusion that contemporaneous use of their marks is likely to cause confusion in the marketplace among consumers; the marks are identical and the goods are closely related if not identical.

Priority also is an element of the likelihood of confusion ground. *United Global Media Grp., Inc. v. Tseng*, 112 USPQ2d 1039, 1047 (TTAB 2014). Accordingly, we will focus our attention, as the parties have done, on the issue of priority and the effect of Opposer's alleged abandonment, if any, on this issue. In order to prevail on its Section 2(d) claim, Opposer must establish that it has priority of use over Applicant. However, when a mark is abandoned, as Applicant claims in this case, it becomes available for others to adopt and use as a trademark. Thus, we turn to consider the facts surrounding Opposer's purported abandonment of its AZEKA'S RIBS mark.

By way of background, Tyler's father, Bill, began selling AZEKA'S RIBS in the 1970s, enjoying success until Azeka's Ribs and Snack Shop in Kihei, Maui closed in August 2006. The marinated ribs were "near and dear to the hearts of Maui locals and visitors alike," and everyone familiar with the product apparently has been disappointed for years that it was no longer available. (26 TTABVUE 98-101).

Azeka Building Corp.'s predecessor, AEI, owned Registration No. 1598804 for the mark AZEKA'S RIBS for "special marinated ribs prepared with a secret sauce," issued May 29, 1990; the registration was cancelled on December 2, 1996 due to AEI'S failure to file a Section 8 affidavit of continued use. AEI also owned Registration No. 2734818 for the mark AZEKA'S RIBS for "special marinated ribs prepared with a sauce," issued July 8, 2003; the registration was cancelled on February 14, 2014 due

to the failure to file a Section 9 renewal.[11] The record shows that AEI dissolved in December 2013. (20 TTABVUE 18-19). After that date, Tyler, the president of AEI, continued to wind up AEI's business affairs, including disposition of intellectual property assets. (20 TTABVUE 21-28). This process included execution of a purported assignment (dated May 9, 2014) of the common law rights in the mark to Azeka Building Corp., as well as trade secrets.[12] As noted earlier, Tyler is the president of Azeka Building Corp.

The parties are not strangers. Tyler and Applicant are second cousins (or, according to Tyler, first cousins once removed). (20 TTABVUE 52; 26 TTABVUE 10). Applicant never lived on Maui, but visited during summers. (20 TTABVUE 53). Their fathers worked together at the AZEKA'S RIBS shop in Maui. (26 TTABVUE 35).

In 2013, Applicant called Tyler to inquire about the status of AEI, indicating that he was completing college, and also offering to help with the marketing of any resumption of business under the mark AZEKA'S RIBS. Applicant proposed to do this

---

[11] The Office accepted, on December 31, 2009, a Section 8 affidavit on the basis of AEI'S explanation of its nonuse of the registered mark since August 2006. In its explanation, AEI referred to two licensing negotiations with potential licensees to use the mark. AEI stated: "Because registrant is pursuing two independent avenues for resuming use of the mark on the goods of the registration, one of these avenues should succeed, so it is expected that use of the mark will resume before July 1, 2010." (24 TTABVUE 10). This use was never resumed and the registration was cancelled. "[C]ancellation of a trademark registration does not necessarily translate into abandonment of common law trademark rights. Nor does it establish its owner's lack of intent to use the mark." *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 94 USPQ2d 1315, 1317 (Fed. Cir. 2010).

[12] Given AEI's abandonment of the mark through nonuse (*see* discussion, *infra*), this assignment of the common law rights in the mark amounted to nothing more than an assignment in gross, which passed no rights to Azeka Building Corp. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 216 USPQ 11, 19 (7th Cir. 1989) ("[a]n abandoned trademark is not capable of assignment"). Opposer's standing in this case remains unaffected as standing was established in the context of the surname claim, based upon Opposer's corporate name and the name of its president.

work in conjunction with a college entrepreneurial class project he was formulating. (20 TTABVUE 53). Tyler indicated that AEI was still searching for a licensee, and no mention was made about the rights pertaining to the trademark or the recipe for the ribs sauce. Applicant called a second and third time in 2013, wanting updates on AEI's attempt to "restart" the ribs business. (20 TTABVUE 55-56). Tyler stated that he never gave Applicant permission to use the AZEKA'S RIBS mark. (20 TTABVUE 56-57). Tyler first learned of Applicant's business on April 19, 2014 in an article in The Maui News. (20 TTABVUE 57-58; Ex. 8). Upon reading the article, Tyler was "shocked" because it implied Applicant's business "was a continuation of my father's original product." (20 TTABVUE 58). Tyler went on to testify: "I was shocked, number one, that it was a family member that was – that appeared to me to be trying to ride on the coattails of my father's reputation and product." (20 TTABVUE 58). Tyler received phone calls from family and friends after they read the same article, inquiring about any connection with the former family business. (20 TTABVUE 59-60).[13]

Applicant gave his version of the circumstances surrounding his adoption of the AZEKA'S RIBS mark: His plan "was to start the selling of the ribs, the Azeka's Ribs, as well as the Azeka's sauce ... [He] intended to start it as a family business. (26 TTABVUE 10). According to Applicant, he and Tyler had "mostly over-the-phone conversations as well as e-mail conversations" about the business and trademark "and what I intend to do with the business as well as my intentions to sell the ribs

_____

[13] *See* testimony of Clyde Kono (21 TTABVUE) and Kimberly Vinoray (22 TTABVUE).

17

and the sauce." (26 TTABVUE 11). When asked about Tyler's plans on actively resuming use of the AZEKA'S RIBS mark, Applicant stated: "Every time we talked he said he would eventually get around to it. I'm not sure exactly what that means from his intent, but I always took that as he is not doing it at this time and he does not intend to use it at this time." (26 TTABVUE 12). Applicant testified that when he expressed his intent to start using the mark, Tyler responded "You can go ahead and try." When asked what Applicant understood by that, he stated "That I can move forward with my plans." Applicant's sense of Tyler's comment was that if he tried, he would fail. Further, when asked "But he did specifically say it was okay for you to try?" Applicant responded "Yes." (26 TTABVUE 13). On cross-examination, Applicant conceded that he did not remember Tyler's exact words, but that from Tyler's answer to Applicant's question, his only interpretation was that "You can try to use the Azeka's Ribs trademark in your business." (26 TTABVUE 37-38; 50-51). Applicant then proceeded to draft a business plan as part of his college entrepreneurial class project, and began raising money to form a business using the mark AZEKA'S RIBS. (26 TTABVUE 14-24). Applicant subsequently began selling the ribs with sauce under the mark. (26 TTABVUE 25-26).

Applicant asserts that Opposer (and its predecessor AEI) have had multiple periods of nonuse of at least three years, the most recent being 2012-2015. According to Applicant, Opposer has no evidence of development, testing, design or manufacture of any product, let alone sales since 2006; rather, it merely has sent out a few batches

18

of emails, and received a few more, idly discussing the possibility of licensing. Applicant sums up his argument as follows:

> [Opposer] stopped all use of its mark in commerce clear back in 2006—over ten years ago now. It dissolved its business, took its website down, and let its registration for "AZEKA'S RIBS" become abandoned. Not until it learned of Applicant's business and trademark application did it suddenly jump to attention and start taking steps to try to reclaim its mark. And, not until it was required to provide proof of its licensing efforts did it suddenly undertake a mini-barrage of specious efforts to seek a license. The timing of these steps actually does more harm to Opposer's case than it helps, because it demonstrates that Opposer's real intent is nothing but to hoard its mark and keep it from Applicant.
> (31 TTABVUE 28).

Opposer acknowledges that its predecessor AEI stopped selling food products under the mark AZEKA'S RIBS in 2006, and that no products were sold by either of them between the August 11, 2006 closing of AEI's store and now. (34 TTABVUE 6-7). When AEI closed its shop in 2006, it issued an announcement on its website thanking the community for its support. (24 TTABVUE 28). Opposer maintains, however, that it did not intend to abandon its trademark rights. Instead, Opposer intended to resume use; although it has not resumed use to date, Opposer points to its licensing efforts from 2007 through 2016 as evidence of its intent to resume use and, accordingly, no abandonment. Opposer contends that the licensing discussions show that goodwill associated with the mark has not dissipated since the mark was last used in 2006. According to Opposer, "[a] finding of abandonment is particularly inappropriate in this case, not only because it would impose an inequitable forfeiture

19

of Opposer's rights, but also because of the apparent continuing recognition of the 'AZEKA'S RIBS' mark in the marketplace." (28 TTABVUE 34).

Under Section 45 of the Trademark Act of 1946, 15 U.S.C. § 1127, a mark shall be deemed abandoned:

> (a) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark.

There are two elements to an abandonment claim: nonuse of the mark and intent not to resume use. *Noble House Home Furnishings, LLC v. Floorco Enters., LLC*, 118 USPQ2d 1413, 1417 (TTAB 2016). If a plaintiff or, as in this case, a defendant raising abandonment as an affirmative defense against prior common law rights, can show three consecutive years of nonuse, it has established a prima facie showing of abandonment, creating a rebuttable presumption that the mark was abandoned with intent not to resume use. The burden of production (*i.e.*, going forward) then shifts to the defendant, or, as in this case, the plaintiff, to produce evidence that it has either used the mark or that it has intended to resume use. The burden of persuasion remains with the party attempting to prove abandonment by a preponderance of the evidence. *See On-Line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1476 (Fed. Cir. 2000); *Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 14 USPQ2d 1390, 1393 (Fed. Cir. 1990); *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 13 USPQ2d 1307, 1310 (Fed. Cir. 1989); *J.G.*

*Hook, Inc. v. David H. Smith, Inc.*, 214 USPQ 662, 665 (TTAB 1982), citing *Burroughs Wellcome Co. v. Warner-Lambert Co.*, 203 USPQ 191 (TTAB 1979). In the present case, of course, it is Applicant who is claiming that Opposer has abandoned its mark, thereby freeing up the mark for Applicant's adoption and use and, accordingly, negating Opposer's claim of priority.

Tyler, Opposer's president, testified that his father Bill began making ribs with a "secret sauce" in the 1970s on Maui, Hawaii: "The product was marinated beef short ribs, the marinate of which was my father's product/invention that he developed and perfected over time, into which the meat, the beef short ribs were marinated and then subsequently sold in uncooked form." (20 TTABVUE 9-10). The product was sold at Azeka's Market (originally named Azeka's Place), a grocery store Bill owned. In 1996, the Azeka family business formed into AEI, of which Tyler was president. Bill died in 2000 and, upon his death, the business was "turned over" to Tyler. (20 TTABVUE 11-12). AEI stopped selling ribs under the pleaded mark in August 2006. (20 TTABVUE 12; 29-30). Tyler indicated that sales were discontinued because the lease for Azeka's Market expired; although the market never reopened at another location, Tyler stated that there was no intent "to forever discontinue" use of the mark. (20 TTABVUE 15). Since that time, neither Opposer nor AEI resumed use of the AZEKA'S RIBS mark.

The testimony clearly shows that Opposer has not used the mark in the ordinary course of trade for over ten years. Accordingly, this nonuse for a period in excess of

three consecutive years establishes prima facie abandonment of the mark AZEKA'S RIBS. Opposer does not deny its nonuse of the mark since 2006. (34 TTABVUE 11).

Given Applicant's prima facie case of abandonment, there is a rebuttable presumption that Opposer abandoned its mark with intent not to resume use. The burden of production (*i.e.*, going forward) shifts to Opposer to produce evidence that it has intended to resume use. We thus turn to consider Opposer's evidence related to its purported intent to resume use.

In an attempt to rebut Applicant's prima facie case, Tyler testified that after use of the mark ceased, "we started our search for potential candidates for licensure … qualified candidates that we could license to continue the product under our licensing agreement." (20 TTABVUE 16; Ex. 2, 20 TTABVUE 84-107). He then went on to recount the various search activities. Tyler testified concerning Exhibit 7 to his testimonial deposition, which comprises a series of emails and letters from and to various individuals. (20 TTABVUE 118-138). The record shows these activities as set forth below.

Barbara Mosle of Saag's Sausages, located in California, had discussions with Tyler about a license in 2007. They exchanged emails, but no formal negotiations ever took place. (20 TTABVUE 50-51).

In March 2008, Tyler received an email inquiry from Stella Blues (via one of its owners, Kale Bovermann), a restaurant on Maui about a license. No discussions were held, and the restaurant is no longer in business. (20 TTABVUE 49-50).

In 2008, Kenichi Akiyama, a self-employed travel agent, approached Opposer, which then drafted a proposed license agreement. (20 TTABVUE 16; Ex. 2, 20 TTABVUE 84-107). Mr. Akiyama expressed an interest, upon hearing that Opposer had ceased operations, to have his proposed Aki's Café produce and sell AZEKA'S RIBS. The license was never completed due to the loss of financial backing for Mr. Akiyama's proposed restaurant, as the economic recession hit in 2008. Tyler and Mr. Akiyama remained acquaintances, with some interactions at different business and social functions. Mr. Akiyama "continued to express interest in wanting to take over or continue manufacturing and selling AZEKA'S RIBS because it was such a popular product." (20 TTABVUE 17-18). The most recent discussions between the two occurred in February 2016, when Mr. Akiyama expressed a continuing interest in the mark in connection with "his second attempt at establishing Aki's Café"; nothing in the record indicates, however, that the café ever opened. (20 TTABVUE 20). According to Tyler, the only "active discussions" with anyone about licensing the mark are with Mr. Akiyama. (20 TTABVUE 40).

Tyler drafted a letter to the meat department manager of Costco on Maui in November 2010, but never heard back, and Costco is not considered a licensing candidate. (20 TTABVUE 47-48). That same month, Tyler also contacted Whole Foods grocery store about AZEKA'S RIBS, but never received a response. (20 TTABVUE 48-49).

Opposer received in 2011 a letter from a Mr. Barbieri (living in Washington state) who had an interest in obtaining a license; however, Opposer did not follow up with him. (20 TTABVUE 37-38; Ex. 7, 20 TTABVUE 128, 137-138).

Through a mutual contact, Tyler received in 2011 an inquiry from Peter Lappin of Western Quality Meats about licensing the mark in Canada. Although Tyler responded, no negotiations followed. (20 TABVUE 38-40; Ex. 7, 20 TTABVUE 132, 135).

Higa Market, a wholesaler and retailer of meat products in Honolulu, Oahu, by way of Todd Oda (Opposer's former sales representative), from whom Opposer purchased ribs, expressed an interest in a license, and there were "a few" calls during 2011-2012 between Tyler and Mr. Oda. Although Tyler considers Higa Market to be "a potential candidate for licensing," there have been no discussions since 2012. (20 TTABVUE 43-44; Ex. 7, 20 TTABVUE 134).

Opposer also received an email in 2012 from an interested party, Mr. Noguchi, in Japan to produce AZEKA'S RIBS under license in Japan. Other than the one email (translated and forwarded by Yuji Takagi), there was no contact between the two. (20 TTABVUE 34-35; Ex. 7, 20 TTABVUE 124-126).

After 2012, there appears to be a three-year gap until the next licensing activity in 2015, coming *after* the commencement of this proceeding in September 2014. There is an email to Jan Tsukazaki (a cousin of Tyler) of Food Solutions (parent company of Zippy's food outlet located in Hawaii), and there were discussions in 2015 regarding Zippy's desire to sell pre-cooked ribs, rather than raw ribs (as Opposer sold them

when it was an active business). Opposer previously indicated in 2006 that it was not willing to offer Food Solutions an exclusive license, and reiterated in 2015 that it wanted to keep its options open. Thus, no additional discussions took place. (20 TTABVUE 31-32; 64-66; Ex. 7, 20 TTABVUE 118-119, 123).

Also in 2015 Opposer and Lynn Araki-Regan exchanged emails. Tyler discovered that years earlier she had expressed an interest in a license. Being unsure if he had ever followed up on her inquiry, Tyler got in touch with Ms. Araki-Regan, but she did not express a present interest in a licensing opportunity. (20 TTABVUE 33-34; Ex. 7, 20 TTABVUE 120-122).

John and Christine Arabatzis, through their restaurant Pita Paradise Bistro on Maui, contacted Tyler in May 2015. They were "big fans" of AZEKA'S RIBS, serving the product at employee functions, and indicated to Tyler that "if you ever give up doing Azeka's Ribs or retire, I'd be interested in continuing Azeka's Ribs." Tyler delivered a "licensing brochure" to them. Although Tyler considers them to be a "potential continuing candidate" for licensing, there were no discussions after delivery of the brochure. (20 TTABVUE 40-42).

Also in May 2015 Tyler sent a licensing brochure to Kono Sai Akao, owner of two restaurants on Maui, Kono's on the Green and Antonio's. The record is silent as to any actual follow-up discussions. (20 TTABVUE 42).

In three additional instances, Tyler could not pinpoint a time frame in which contact was made regarding a license. Tyler contacted Ah Fook's, a grocery store on Maui, and discussed (via Raymond Hew) a license, but Mr. Hew explained that the

store was not interested, and is not considered to be a licensing candidate. (20 TTABVUE 45). Tyler contacted Pukalani Superette, which was "interested briefly" but declined to pursue further negotiations. (20 TTABVUE 46-47). Opposer's accountant indicated to Opposer that he had a client who managed a grocery store, Haiku Grocery Store, and that he was interested in a licensing opportunity. However, contact was never made between Opposer and the grocery store. (20 TTABVUE 35-36).

Opposer's statement that it never had an intention to abandon the mark, without more, is of little importance. *See Imperial Tobacco Ltd. v. Philip Morris Inc.*, 14 USPQ2d at 1394 ("In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest."). *See also Cerveceria Modelo S.A. de C.V. v. R.B. Marco & Sons Inc.*, 55 USPQ2d 1298, 1303 (TTAB 2000). Thus, to support a finding of intent to resume use of the mark the owner must do more than simply assert a vague, unsubstantiated intent to make use of the mark at some unspecified time in the future. Rather, the owner must build a record "with respect to what activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred." *Imperial Tobacco Ltd. v. Philip Morris Inc.*, 14 USPQ2d at 1394.

"Once the challenger shows discontinued use, the owner must produce evidence of intent to resume use 'within the reasonably foreseeable future.' … Of course, what is meant by the 'reasonably foreseeable future' will vary depending on the industry

and the particular circumstances of the case … it might be reasonable for a fire truck manufacturer to spend five or six years considering the reintroduction of a brand, even though the same passage of time would be unreasonable for a maker of a more ephemeral product, say potato chips." *Emergency One Inc. v. Am. FireEagle Ltd.*, 228 F.3d 531, 56 USPQ2d 1343, 1348 (4th Cir. 2000). A food preparation business does not have particularly high barriers to entry. Here, Opposer's goods are an easily produced and distributed food product. Opposer cannot rely on desultory efforts to license a mark for such a product to keep someone else from adopting a mark it has abandoned – a mark it can neither maintain on the register nor use in a commercially significant way. *See Gen. Motors Corp. v. Aristide & Co., Antiquaire de Marques*, 87 USPQ2d 1179, 1183 (TTAB 2008); *Hornby v. TJX Cos. Inc.*, 87 USPQ2d 1411, 1421 (TTAB 2008).

Upon close and careful consideration of Opposer's attempts to license the mark, we find that the attempts, both individually and collectively, fall short of rebutting the presumption of abandonment. The period of Opposer's nonuse of the mark AZEKA'S RIBS exceeds ten years. This lengthy period of nonuse heightens the inference of intent not to resume use, especially given the nature of the product. The only licensing attempt of any consequence appears to be the one with Aki's Café; even then, however, those discussions occurred in 2008, over 8 years ago; more recent discussions in 2016 revolved around a planned restart of Aki's Café, but nothing in the record reveals that the café was ever opened. All of the other sporadic licensing activities, which effectively added up to nothing more than isolated discussions, do

not establish an intent to resume use. After use stopped in August 2006, until 2016, Opposer recounted approximately fifteen contacts with licensee prospects; virtually all of the contacts involved a single email or discussion, with little to no follow-up. In several instances, the contact was initiated by a third party, not Opposer; in these instances, the record falls short of showing that Opposer responded to or seriously considered any of the unsolicited inquiries in a manner that permits us to infer an intent to resume use of the AZEKA'S RIBS mark. Essentially the evidence in this case does not show, except in one instance, focused negotiations toward execution of a license agreement; rather, these mostly "one and done" contacts were sporadic, cursory and, given the lack of Opposer's follow-up in most instances, half-hearted, with zero licenses executed. Opposer's efforts were neither consistent nor sustained. Evidence of vague discussions concerning the potential use of the mark at some unknown point in the future are insufficient to show an intent to resume use. *Rivard v. Linville*, 133 F.3d 1446, 45 USPQ2d 1374, 1376-77 (Fed. Cir. 1998); *Imperial Tobacco Ltd. v. Philip Morris Inc.*, 14 USPQ2d at 1396; *Auburn Farms Inc. v. McKee Foods Corp.*, 51 USPQ2d 1439, 1443-45 (TTAB 1999). *See also Emergency One Inc. v. Am. FireEagle Ltd.*, 56 USPQ2d at 1347-48 ("Requiring the owner to have an intent to use the mark in the reasonably foreseeable future ensures that valuable trademarks are in fact used in commerce as the Lanham Act intends, rather than simply hoarded or warehoused."). In any event, putting aside its licensing attempts, Opposer has not given any explanation or reason why it could not use the mark AZEKA'S RIBS on its own in the absence of a license; the record simply is devoid of

any evidence showing a specific and consistent plan to resume use during a period of ten years. *See Hornby v. TJX Cos. Inc.*, 87 USPQ2d at 1421 ("Petitioner has not provided any excuse or indeed any reason at all for this long period of nonuse, nor has she provided any evidence about her plans to resume use of the mark … 'Use' of a mark means 'the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.' Merely because a party used a mark a long time ago and it could use the mark in the future is not sufficient to avoid abandonment."). *See also Silverman v. CBS Inc.*, 870 F.2d 40, 9 USPQ2d 1778, 1783 (2d Cir. 1989).

Accordingly, we conclude that Opposer's pleaded mark is abandoned, that is, there has been nonuse since 2006 with intent not to resume use. Opposer cannot demonstrate priority of use of its pleaded mark, and the likelihood of confusion claim fails.

### *Decision:*

The opposition is dismissed on the ground of likelihood of confusion. The opposition is sustained on the ground that the proposed mark is primarily merely a surname, and registration to Applicant is refused.